UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 1:20-CR-128-MR-WCM |
| | ) | |
| | ) | **BILL OF INFORMATION** |
| vs. | ) | |
| | ) | Violation: |
| | ) | 18 U.S.C. § 371 |
| STEIN AGEE, | ) | |
| Defendant. | ) | |

**FILED**
ASHEVILLE, N.C.

DEC 1 6 2020

**U.S.** DISTRICT COURT
W. DIST. OF N.C.

## THE UNITED STATES ATTORNEY CHARGES:

### Introductory Paragraphs

1.     Beginning at least as early as 2013, and continuing through at least December 2019, in the Western District of North Carolina and elsewhere, the defendant, STEIN AGEE, and others known and unknown to the United States Attorney, knowingly participated in a scheme to defraud the IRS by organizing, marketing, implementing, and defending tax shelters in the form of fraudulent syndicated conservation easements ("SCEs"), and by using means and methods intended to deceive the IRS about the legitimacy of those transactions and about the circumstances under which the fraudulent tax shelters were marketed and implemented.

2.     Defendant STEIN AGEE ("AGEE") and his co-conspirators organized, marketed, and implemented the fraudulent SCEs for wealthy clients through false and fraudulent means, including preparing and causing to be prepared, and filing and causing to be filed by the clients with the IRS, false and fraudulent U.S. individual income tax returns reporting the fraudulent SCE tax shelter losses, resulting in the payment of far lower taxes by the clients, in order to enrich themselves personally through the generation of fee and commission income. AGEE and his co-conspirators also utilized the SCE tax shelters to evade their own taxes on the substantial income received, at least in part, through the sale of the fraudulent SCE tax shelters.

3.     In total, the conspiracy caused more than $250 million in tax losses to the United States of America.

1

## The Defendant and Associated Individuals and Entities

4. From in or around 2000 through the present, AGEE worked as an accountant at an Atlanta-based accounting firm ("Accounting Firm 1"). In or around 2007, AGEE became a partner at Accounting Firm 1. Shortly thereafter, in or around 2008, AGEE became the tax partner, responsible for managing Accounting Firm 1's staff accountants and reviewing tax returns prepared by the firm. In addition to his role as the tax partner, AGEE also maintained his own set of clients within the firm with whom he worked directly to provide accounting and tax planning services.

5. Promoter A, a co-conspirator known to the United States, was a partner at Accounting Firm 1 until in or around 2002, when he left the firm to start Company 1. Through Company 1, Promoter A, together with others, including AGEE, marketed "real estate investment funds" which were, in reality, tax shelters in the form of fraudulent syndicated conservation easements (the "SCE Funds" or "Funds").

6. AGEE and two other partners from Accounting Firm 1 used LLC-1 to, among other things, hold various income generating assets in which the three partners made investments.

7. Since at least 2008, Promoter A and Company 1—sometimes directly, and sometimes through various corporate intermediaries—have occupied the role of "manager" for the SCE Funds. In total, Promoter A, through Company 1, has organized, promoted, and sold at least 23 SCE Funds.

8. AGEE prepared and managed the preparation of the SCE Funds' federal income tax returns from 2008 until approximately March 2020. AGEE also assisted Promoter A with forming and registering new entities and obtaining EINs for the various entities used in implementing the SCE Fund transactions.

9. Attorneys A and B, co-conspirators known to the United States, worked for Promoter A and Company 1 since at least 2012. Attorneys A and B assisted Promoter A with the creation, marketing, and implementation of the fraudulent syndicated conservation easement tax shelters.

10. Attorney C is outside counsel for Promoter A and Company 1 and has provided legal advice and audit support related to Promoter A's SCE Funds since in or around 2011.

2

11.     Attorney D, a co-conspirator known to the United States, assisted Promoter A and other co-conspirators with drafting promotional material for the SCE Funds and promoted the SCE Funds to his own clients, as well as organizing and selling his own syndicated conservation easement funds to his clients.

12.     Land Conservancy 1 is a purported non-profit 501(c)(3) organization, founded in North Carolina, that claims to be "dedicated to protecting natural resources through conservation easements."

13.     Land Conservancy 2 is a purported non-profit 501(c)(3) organization founded in Pennsylvania that claims its primary purpose is "preserving and managing open space with ecological, agricultural or historical significance."

14.     Individuals A and B are real estate owners who participated in real estate and conservation easement donation transactions with Promoter A and Company 1.

15.     Appraiser 1, a co-conspirator known to the United States, is a licensed appraiser based in North Carolina who performed conservation easement appraisal work for Promoter A and Company 1 since at least 2008.

16.     Appraiser 2, a co-conspirator known to the United States, is a licensed appraiser based in Atlanta, Georgia, who performed conservation easement appraisal work for Promoter A and Company 1 since at least 2015.

## The Internal Revenue Service and Its Forms

17.     The Internal Revenue Service ("IRS") was and is an agency of the United States Department of the Treasury responsible for administering and enforcing the tax laws of the United States.

18.     An IRS Form 1065, U.S. Return of Partnership Income, was and is an information return filed by partnerships to report their income, gains, losses, deductions, credits, etc.  A partnership does not pay tax on its income but "passes through" any profits or losses to its partners.  Partners must include partnership items on their tax and information returns.

19.     A Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., was and is a schedule of the IRS Form 1065 that members of a business partnership use to report their share of a partnership's profits, losses, deductions, and credits to the IRS.

3

The partnership is also required to furnish Schedules K-1 to its partners reporting each partner's distributive share of partnership income or loss, and separately stated items, among other things.

20. An IRS Form 8886, Reportable Transaction Disclosure Statement, was and is an IRS form filed by a taxpayer, including an individual, trust, estate, partnership, S corporation, or other corporations, to disclose information about reportable transactions in which the taxpayer participated. Reportable transactions include "listed transactions." A "listed transaction" is a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has determined to be a tax avoidance transaction. These transactions are identified to the public by notice, regulation, or other form of published guidance as a listed transaction. Under Notice 2017-10, the IRS identified certain syndicated conservation easement transactions as "listed transactions."

21. A Form 8283, Noncash Charitable Contributions, was and is a form taxpayers attached to their individual income tax returns to report information to the IRS about non-cash charitable donations. Conservation easement donations are reported on Forms 8283. Taxpayers claiming a deduction of more than $500,000 for a donated item were required to attach a signed copy of a qualified appraisal of the property to the taxpayer's return. The appraisal must be signed and dated by a qualified appraiser in accordance with generally accepted appraisal standards. The appraiser is required to sign the Form 8283. The donee organization that receives the donated property must also sign the Form 8283 acknowledging the donation. The form is attached to a filed signed tax return and submitted to the IRS.

## Law Related to Syndicated Conservation Easements

*Charitable Deductions, Qualified Conservation Contributions, and Conservation Easements*

22. Pursuant to the Internal Revenue Code (the "Code"), and subject to certain limitations set forth therein and in the associated regulations, a taxpayer may take a deduction for any "charitable contribution" made within the taxable year. The amount of the deduction generally equals the fair market value of the contributed property (here, the value of the conservation easement) on the date of the charitable contribution, except as otherwise specified in the Code.

23. In addition to requiring that payment for a charitable contribution be made during the taxable year for which the associated deduction is claimed in order for the deduction to be valid, the Code generally requires taxpayers to compute their taxable

4

income on the basis of their taxable year. This is commonly known as the "annual accounting period." This annual accounting method does not permit consideration of events happening after the close of the taxable year, nor does it permit the subsequent reopening of a prior year for adjustment of deductions.

24.     Generally, a taxpayer may not claim a charitable contribution deduction for a contribution of a partial interest in property. However, the Code and associated regulations make an exception for a "qualified conservation contribution." A qualified conservation contribution is a contribution of a qualified real property interest, to a qualified organization (such as a qualified 501(c)(3) organization), exclusively for conservation purposes. A contribution is not a qualified conservation contribution unless the conservation purpose of the contribution is protected in perpetuity and certain other requirements are satisfied.

25.     "Conservation purposes" include: (1) the preservation of land areas for outdoor recreation by, or for the education of, the general public; (2) the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem; (3) the preservation of open space (including farmland and forest land) where such preservation is for the scenic enjoyment of the general public, or pursuant to a clearly delineated Federal, State, or local governmental conservation policy and will yield a significant public benefit; and (4) the preservation of an historically important land area or a certified historic structure.

26.     A properly structured "conservation easement" is one type of "qualified real property interest," under the Code and associated regulations, the donation of which by a taxpayer can form the basis for a charitable contribution deduction. A conservation easement is a legal agreement through which a landowner and another party, typically a non-profit, agree to permanently restrict the development and/or use of the land with the purpose of achieving certain conservation or preservation goals. For example, a taxpayer might donate an easement to a land trust restricting any development of a large tract of woodland property that would be inconsistent with the preservation of that property as an intact habitat for certain wildlife species.

27.     Subject to certain exceptions, when an individual taxpayer donates a conservation easement as a charitable contribution in a manner consistent with the Code and associated regulations, that taxpayer may use the deduction associated with the donation of the easement to offset up to 50 percent of his or her taxable income for the relevant taxable year, and may carry forward any excess for up to 15 years. The total amount the taxpayer may deduct depends on the fair market value of the contribution—that is, on the fair market value of the conservation easement.

5

*Pass-Through Entities, Partnerships, and Economic Substance*

28.     An entity taxed as a partnership is referred to as a "pass through" or "flow through" entity because it is not itself liable for income tax. Instead, its partners, or members, are proportionally liable, in their separate or individual capacities, based on the income, losses, deductions, or credits "passed through" the entity.

29.     Each partner takes into account his or her share of the partnership's income or loss and any "separately stated items" in computing his or her income tax liability. "Separately stated items" are specific items of income, gain, loss, deductions, and/or credits that a partner must account for separately. A charitable contribution, such as a conservation easement donation, constitutes a "separately stated item."

30.     For tax purposes, the term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is operated, and which is not a corporation or a trust or estate. A limited liability company ("LLC") with two or more members is treated as a partnership for federal income tax purposes unless it affirmatively elects to be treated as a corporation.

31.     If a partnership is organized with no business purpose other than tax avoidance, then the partnership lacks economic substance and/or is a sham under federal tax law. According to the Code, the "economic substance doctrine" means that a transaction shall be treated as having economic substance only if (A) the transaction changes in a meaningful way (apart from federal income tax effects) the taxpayer's economic position, <u>and</u> (B) the taxpayer has a substantial purpose (apart from federal income tax effects) for entering into such transaction.

## The Syndicated Conservation Easement Tax Fraud Scheme

*General Overview of Fraud in the Design, Marketing, and Implementation of the SCE Funds*

32.     From at least in or about 2013 through 2018, the design, organization, promotion and sale of the SCE Funds were carried out in a similar manner. The SCE Funds organized, promoted, and sold by Promoter A, AGEE, and other co-conspirators were designed to produce bogus tax deductions for high-income taxpayers through partnership entities that lacked both economic substance and business purpose. The transactions existed merely to provide tax deductions to their so-called investors.

6

33. Although facially described in promotional material as real estate investment funds, the SCE Funds were, in reality, illegal tax shelters that allowed taxpayers to buy tax deductions at the end of any given tax year—as well as after the end of a given tax year—to shelter their income from the IRS, with no economic risk.

34. Promoter A, as well as other co-conspirators, were well aware of the need to make the SCE Funds appear to have economic substance so that the IRS would accept the bogus deductions. In a recorded call on November 9, 2018, Promoter A informed an undercover agent posing as a potential investor, "[w]e know that if we're examined by the [IRS] they will ask for all promotion materials, so you have to be very, very careful that these look like real estate investments as compared to, you know, basically a tax shelter." However, in reality, according to AGEE, each one of his clients who participated in the SCE Funds participated for the purpose of purchasing a tax deduction to reduce their tax liability.

35. The same was true throughout Promoter A's enterprise. To generate the appearance of compliance and to deceive the IRS, Promoter A and his co-conspirators generated marketing materials, including a private placement memorandum ("PPM"), for each of the SCE funds and provided them to potential investors and/or the financial advisors, accountants, or attorneys who served as sub-promoters for Promoter A. On the surface, these marketing materials advised the investors that the investment returns could come in the form of any of "income production, capital appreciation and/or tax benefits," and that the Fund only might "achieve its objectives" by making tax-deductible donations of its property (or portions thereof) to a charitable organization. Furthermore, on the surface, the PPMs claimed that investors could choose from one of three options for the fund: (1) the development of the real property (the "Development Option"); (2) the holding of the real property for appreciation (the "Buy and Hold Option"), or (3) the placement of a substantial portion of the real property into a conservation easement for tax benefits (the "Green Investment Option").

36. In a similar vein, on the surface level, the PPMs typically advised investors that, following the acquisition of the real property in question, Company 1, as the "manager" of the fund, would make a "recommendation" to the investors about which one of the three options to pursue, and the investors would then formally vote on whether or not to approve the selected option. According to one PPM, "if" the Green Investment Option were chosen through this process, the investors could offset up to 50% of their adjusted gross income as a result of the donated conservation easement.

37. As noted above, these materials were knowingly drafted to create an illusion of legitimacy. Promoter A enlisted professionals, including Attorney D, to assist with drafting the promotional materials to ensure that the SCE Funds appeared

7

legitimate. For example, with respect to the language of the PPM for one of the SCE Funds, Attorney D cautioned Promoter A, "be careful stating anywhere that conservation/preservation is the likely outcome," even though it was, in fact, the intended and certain outcome. Similarly, after referencing a specific provision of the PPM, Attorney D cautioned Promoter A that it "sounds like conservation/preservation is pre-determined," which it was.

38.    In reality, and just as the co-conspirators intended, for every single one of the SCE Funds promoted and offered by Promoter A, AGEE, and the other co-conspirators for the 2013 through 2018 tax years, the purported investor/taxpayer "vote" resulted in the selection of the "Green Investment Option"—meaning the tax benefits option. These "votes" were not true votes by the investors, and the outcome was in fact predetermined. In other words, the placement of a conservation easement over the real estate for any given SCE Fund was always a foregone conclusion.

39.    Indeed, in many instances, the co-conspirators were telling the investors how to "vote" to add to the superficial appearance of legitimacy, while simultaneously marketing the SCE Funds to the investors directly as pure tax shelters, despite the marketing materials' superficial claims to the contrary. For example, for at least one SCE Fund, Promoter A advised, and requested AGEE to advise, certain wealthy clients with large "investments" to vote on paper for the "Development Option," in order to make it appear that the "vote" was a true vote with differing opinions and not a foregone conclusion, even though those clients only entered into the transaction for the tax benefits and expected that the tax benefit option would be implemented after the "vote." AGEE did, in fact, advise several clients to vote for the "Development Option," and those clients followed his instructions.

40.    In other efforts to make the SCE Funds appear to have economic substance beyond the purchase of tax benefits, despite knowing that they did not, the promotional materials also indicated that the "residual property"—the property remaining after the donation of the conservation easement—would eventually be developed or sold. However, in reality, little, if any, of the residual property for the 2013 through 2018 funds has ever been meaningfully developed. Promoter A did not make formal requests for additional capital from the Funds' "investors" in order to develop the residual property, nor did he sell any of the residual property and provide the proceeds to investors.

41.    As noted above, while Promoter A and some of his co-conspirators, especially his attorneys, were busy drafting marketing materials for the SCE Funds that were knowingly designed to mislead the IRS in the event of an examination, Promoter

8

A and certain other co-conspirators were simultaneously marketing the SCE Funds to investors directly as pure tax shelters.

42.     Several of Promoter A's sub-promoters were, like AGEE, in the accounting and/or tax preparation business, and, on Promoter A's instructions, they marketed Promoter A's SCE Funds to wealthy clients anticipating large tax bills by promising that an "investment" in the SCE Funds would return a tax savings ratio of at least 4:1—often between 4.2:1 and 4.5:1. In other words, for every dollar the client paid to Promoter A to become an "investor" in a SCE Fund, the client-taxpayer would be purchasing more than four dollars' worth of tax deductions. Many of the marketing materials Promoter A used to advertise SCE Funds to clients listed examples of the tax value of an individual investor's charitable contribution deduction based upon a hypothetical amount of cash invested. These marketing materials also assured investors that, even in the event of an "IRS Examination" resulting in an adjustment, the investors' tax savings would still be significant.

43.     Promoter A set these "ratios" for the SCE Funds by balancing the need to make the tax shelter purchase desirable for prospective investors against the need to avoid and protect against IRS scrutiny. For example:

   a.  During a recorded call on November 9, 2018, Promoter A explained to an undercover agent that he and other co-conspirators specifically set the tax savings ratio to account for the possibility of an IRS audit resulting in an adjustment to the deduction. Promoter A explained that he and his team set the ratio to "allow enough room in there that if there's a deduction [sic]... people can still get a good return on their money." Promoter A also stated that he and his team, for each of the SCE Funds, set aside between $1 million and $1.5 million in reserve for legal defense.

   b.  During a separate recorded meeting on November 15, 2018, with an undercover agent, Promoter A and Attorney A discussed the tax benefits generated by the fund by explaining that investors can be assured of getting a return on their investment, "... because whatever the amount of the deduction is, that's how we—we limit the amount of the investors that come in such that we can get you your 4.5 to one [tax deduction/investment ratio]."

44.     Promoter A, Attorney A, and other co-conspirators would determine and distribute a preliminary "ratio" for any given SCE Fund to AGEE and the other sub-promoters around the time the SCE Fund was announced, but before its release, so

9

that the sub-promoters could begin marketing the tax shelter to high net-worth individuals using that tax savings ratio. The ratio was often correlated to a preliminary appraisal of the value of the easement performed by either Appraiser 1 or Appraiser 2. Indeed, for every SCE Fund that AGEE sold, the final ratio for tax savings always nearly matched the preliminary ratio, and the preliminary appraisal performed by Appraiser 1 or Appraiser 2 always nearly matched the final appraisal of the value of the easement.

45.    That was because Promoter A was pre-determining the value of the easement before any appraisal was performed, in order to be able to market the desired tax savings ratio to prospective "investors" early on. Indeed, many of Promoter A's marketing materials informed "investors" of the value of the "CE Deduction" (meaning the value of the easement) long before the final appraisal had been performed. Promoter A, AGEE, and some of their co-conspirators regularly provided the tax savings ratio to prospective investors before Appraiser 1 or Appraiser 2 had performed or written a final appraisal on the value of the easement.

46.    Furthermore, for at least six SCE Funds organized and sold between 2013 and 2018, Promoter A, AGEE, and other sub-promoters marketed and sold units to investor-taxpayers after the tax year had concluded. These investor-taxpayers were not members of the pass-through entity at the time the charitable contribution was made by the pass-through entity, nor were they members at the time the tax year in which the charitable contribution was made came to a close, and they therefore could not claim a lawful deduction for the SCE Fund's charitable contribution.

47.    Nonetheless, these late "investors" did claim deductions related to their SCE donations, often aided in doing so by the co-conspirators assisting them with the backdating of subscription agreements and checks to make the "investments" appear more legitimate. Late investors backdated documents, including payments, subscription agreements, and other related documents. Promoter A, AGEE and other co-conspirators used several different methods to facilitate and disguise the late sales. For example:

    a.  In at least one instance, Promoter A, AGEE, and other co-conspirators created, or caused to be created, two "shell" entities that were used to hold and sell units in a SCE Fund after the close of the tax year.

    b.  In other instances, Promoter A, AGEE, and other co-conspirators, backdated, and caused to be backdated, subscription agreements, checks, and other documents related to the transactions.

10

c. In yet another instance, Promoter A, AGEE, and other co-conspirators used purported "promissory notes" to attempt to cover up the late transactions.

48.     After the instance described in Paragraph 47(a) above, which was in 2013 and 2014, Promoter A, AGEE and other co-conspirators determined that they did not need to create separate registered entities to hold and sell unsold units in their SCE Funds after the close of the relevant tax year. Instead, the unsold units were allocated to a placeholder "investor," in their internal books, named "LTS." "LTS" was an acronym for "Left To Sell," and the "LTS" entry on the enterprise's books represented units of tax shelter that the co-conspirators still had left to sell to "investors" after the close of the relevant tax year. AGEE would prepare, or cause to be prepared, Schedules K-1 issued to LTS as a placeholder, in order to allow the other Schedules K-1 (for clients who were already invested in the SCE Fund) to be distributed to the investors in a timely way without disrupting the partnership allocations. Later, after the units allocated to LTS were sold, additional Schedules K-1 would be issued to the late-joining investors, without requiring any modification to the Schedules K-1 already issued.

49.     As noted above, in many instances of late "investments," Promoter A, AGEE, and other co-conspirator/sub-promoters instructed investor-taxpayers to backdate transaction documents and backdate checks to make it appear to the IRS as if the late "investments" were made during the correct tax year. Furthermore, in order to deceive the IRS in the event of any future examination, Promoter A, AGEE, and other co-conspirators typically required late investors-taxpayers to make their payments by backdated checks instead of wiring the payments to the SCE Funds' accounts. That was because, in the event of government scrutiny, the co-conspirators knew that the government would easily be able to determine the dates of wire payments through the collection of bank records from third parties.

50.     After securing "investments" by marketing the SCE Funds to wealthy individuals in the manner described above, both before and after the relevant tax year closed, Promoter A, AGEE, and other co-conspirators thereafter caused false and fraudulent tax returns to be prepared and filed by the investor-taxpayers using the fraudulent SCE charitable contribution deductions. These SCE deductions were fraudulent because the underlying transactions lacked economic substance and business purpose other than providing tax deductions, because the appraisals performed by Appraiser 1 and Appraiser 2 were falsely inflated, and because, in many instances, the charitable contribution was made before the investor was a member of the SCE Fund, and the investor did not even subscribe to the SCE Fund or transfer any money until after the relevant tax year had closed.

11

Inland Capital Investment Fund 2013

51.    On or about July 3, 2013, Promoter A, together with Attorneys A and B, organized Inland Capital Investment Fund 2013 ("ICIF 2013") as a North Carolina limited partnership.  On or about December 15, 2013, ICIF 2013 purchased a 98% interest in Fort Myers Limited Partnership ("Fort Myers") which owned real property located in the Western District of North Carolina.

52.    Fort Myers owned a 405-acre tract of land located in Buncombe County, North Carolina.  In 2011, Individual A and Individual B purchased Fort Myers for the purchase price of $650,000.  On or about December 23, 2013, Individuals A and B had entered into an agreement with Promoter A wherein Promoter A agreed to pay Individuals A and B $7 million for a 98% interest in Fort Myers.  The $7 million purchase price Promoter A agreed to pay to Individuals A and B was to be funded by a portion of the proceeds paid to ICIF 2013, as a SCE Fund, by investor-taxpayers.

53.    Prior to finalizing the purchase of an interest in Fort Myers, Promoter A began marketing interests in ICIF 2013 as a SCE Fund to prospective investors.

54.    Similar to all of the other SCE Funds, the purported "business plan" for the Fort Myers real property to be acquired by ICIF 2013, as outlined in the PPM, claimed to allow investors to choose from one of the three options: (1) the Development Option; (2) the Buy and Hold Option; or (3) the Green Investment Option.  The PPM further predicted that "if" the Green Investment Option were chosen, then the conservation easement would be donated to Land Conservancy 1.  However, in reality, the "Green Investment Option"—that is to say, the tax shelter option—was a foregone conclusion.

55.    On December 30, 2013, Fort Myers, now majority-owned by ICIF 2013, donated a conservation easement over approximately 280.96 acres of the Fort Myers real property to Land Conservancy 1.  Appraiser 1, who had been working on valuing the conservation easement since in or around June 2013—nearly six months before any "vote" on whether to pursue the "Green Investment Option" was held—valued the donated easement at $66,214,000, $65.5 million more than the $650,000 purchase price Fort Myers had paid for the entire tract of land just two years prior.

56.    Promoter A, AGEE, and other co-conspirators sold "investment" units in ICIF 2013 to approximately 107 investor-taxpayers.  Many of the units Promoter A, AGEE, and other co-conspirators/sub-promoters sold to investor-taxpayers were sold

after the close of the tax year. As described more fully below, Promoter A, AGEE, and Attorneys A and B agreed to use two special purpose entities to disguise the late "investments" into ICIF 2013.

57. The $66,214,000 "charitable contribution" by Fort Myers, like the corresponding tax deduction, was passed through ICIF 2013 to each client-taxpayer partner of ICIF 2013 as well as to Individuals A and B, based on their respective ownership percentage.

58. Each client-taxpayer received a Schedule K-1 from ICIF 2013 reporting a charitable contribution deduction of more than four times his or her initial capital contribution, just as Promoter A had promised. Each client-taxpayer reported the flow-through charitable contribution on his or her respective individual tax return and applied the corresponding deduction to reduce his or her tax liability.

### Green Fields and Petite Pines

59. ICIF 2013 was not fully subscribed at the close of the 2013 tax year, meaning Promoter A and his co-conspirators had not yet sold all of the available units in the SCE Fund. So, in order to facilitate and disguise sales of units in ICIF 2013 after the close of the tax year, Promoter A, AGEE, and Attorneys A and B agreed to form special purpose vehicles and allocate the unsold units to those entities. Promoter A, together with Attorney A and Attorney B, caused two special purpose vehicles to be formed: (1) Green Fields Investments, LLC ("Green Fields") and (2) Petite Pines Holdings, LLC ("Petite Pines"). Promoter A allocated unsold units in ICIF 2013 to each of these entities as of the end of 2013. Then, during 2014, Promoter A, AGEE, and other co-conspirators/sub-promoters continued to sell units in ICIF 2013 to investor-taxpayers both directly and indirectly through Green Fields and/or Petite Pines even though the tax year was already closed.

60. Green Fields was organized on or about December 27, 2013, by Attorney A. Ultimately, Green Fields had 22 investor-taxpayers, at least two of whom were AGEE's clients. In addition to selling units in ICIF 2013 through Green Fields, AGEE was a signatory on the Green Fields bank account that was opened in April 2014, and AGEE prepared the Green Fields Form 1065, Federal Partnership Return, and related Schedules K-1. Green Fields, through ICIF 2013, received a pro-rata portion of the conservation easement donation deduction in the amount of $22,826,790. The deduction was then passed through to its investor-taxpayers on a pro-rata basis. Every single investor in Green Fields, which was formed to hold units of ICIF 2013 that were not sold at the close of 2013, invested after the charitable contribution had already been made and after the relevant tax year had already closed.

13

61. Furthermore, Promoter A arranged for some of the unsold units held by Green Fields to be given, for free, to certain individuals whose "investments" in a prior SCE Fund organized by Promoter A had been reduced following a previous IRS audit, thereby diluting the shares of the investors who actually paid to participate in ICIF 2013, and without disclosing the arrangement to those paying investors.

62. Promoter A also organized, and caused to be organized, Petite Pines in or around December 30, 2013. In or around September 14, 2014, AGEE prepared a false Form 1065, U.S. Return of Partnership Income, for Petite Pines reporting a flow-through conservation easement charitable deduction from ICIF 2013. AGEE also prepared false Schedules K-1 for Petite Pines that reported the ICIF 2013/Petite Pines flow-through conservation easement charitable contribution deduction to the investors-taxpayers, on a pro-rata basis, in the total amount of $2,837,146. Here, again, every investor in Petite Pines subscribed to the fund after the charitable contribution had already been made and after the tax year had already closed.

*Specific SCE Funds: Southern Appalachian Investment Fund 2014*

63. On or about October 30, 2014, Promoter A, together with Attorneys A and B, organized Southern Appalachian Investment Fund 2014 ("SAIF 2014"), as a North Carolina limited partnership. SAIF 2014 was formed for the purpose of purchasing an ownership interest in Thompson Mountain Holdings, LLC ("Thompson Mountain"), which owned real property located within the Western District of North Carolina, and for selling tax deductions flowing from the planned donation of an easement over much of that land to investors.

64. Individuals A and B, through Thompson Mountain, had purchased approximately 273 acres of real property in Buncombe and Haywood Counties, in Western North Carolina, for $4,748,441 on or about December 27, 2013. On December 23, 2014, Thompson Mountain donated a conservation easement over approximately 213.632 acres of the real property to Land Conservancy 1. At Promoter A's request, Appraiser 1 ultimately valued that donated easement at $24,240,000.00, despite the fact that Thompson Mountain had purchased the entire tract of real property for nearly $20 million less than that roughly one year prior.

65. In this instance, at the time Thompson Mountain donated the real property to Land Conservancy 1, the SCE Fund formed by Promoter A to sell interests in the donation, SAIF 2014, had not even finalized its purchase of an ownership interest in Thompson Mountain. Individuals A and B and Promoter A had discussed SAIF 2014 purchasing 97% ownership of Thompson Mountain, so that SAIF 2014 could sell

14

interests in the tax deduction to its investors, but that agreement had never been finalized or reduced to writing, due to a dispute between the parties over the allocation of profits from the ICIF 2013 transaction described above.

66. Despite the lack of clarity as to whether SAIF 2014 ever actually owned a share of Thompson Mountain, Promoter A and his co-conspirators marketed and sold interests in SAIF 2014 to numerous investors as tax shelters, and those investors claimed deductions. In total, Promoter A, AGEE, and other co-conspirators sold units of interest in SAIF 2014 to approximately 105 investor-taxpayers. Each of the investor-taxpayers in SAIF 2014 received a false Schedule K-1 improperly reporting a charitable contribution more than four times his or her capital contribution.

67. In this example, as in the preceding one, Promoter A and other co-conspirators sold units of "investment" in SAIF 2014 to investor-taxpayers after the donation was made and after the close of the relevant tax year. The co-conspirators backdated documents and payments related to these late "investments" to make it appear as if the "investments" were timely made.

*Specific SCE Funds: Inland Capital Appalachian Fund 2015*

68. On or about December 22, 2014, Promoter A and other co-conspirators organized Inland Capital Appalachian Fund 2015 ("ICAF 2015"), a Georgia limited liability company. ICAF 2015 was formed for the purpose of purchasing interests in multiple real estate entities, including a 98% interest in Jenny's Lane, LLC ("Jenny's Lane"), which owned approximately 10 acres of real property in Lyon County, Nevada, and for the purpose of selling interests in a subsequent conservation easement donation as tax shelters to investors.

69. On or about December 31, 2015, Jenny's Lane donated an approximately 5-acre portion of the real property to a non-profit organization in Nevada. Appraiser 2 prepared an appraisal valuing the real property at $11,000,000.

70. In addition to Jenny's Lane, LLC, ICAF 2015 purchased a 98% interest in NC Whisper Mountain Holdings, LTD ("Whisper Mountain"). Whisper Mountain owned at least 178 acres of real property in Marshall, North Carolina. On or about December 31, 2015, Whisper Mountain donated a conservation easement on approximately 178 acres to Land Conservancy 1. Appraiser 1 prepared an appraisal valuing the easement at $13,510,000.

71. Promoter A, AGEE, and other sub-promoters sold units of interest in ICAF 2015 to 56 investor-taxpayers. The total $24,019,800 "charitable contribution"

15

and corresponding deduction was passed through ICAF 2015 to each client-taxpayer in the Fund.

72.     Thus, each of the investors in ICAF 2015 received a Schedule K-1 reporting a charitable contribution more than four times his or her capital contribution.

73.     Promoter A, AGEE, and other co-conspirators improperly sold units of "investment" in ICAF 2015 after the close of the tax year. These late sales were fraudulently backdated to make it appear as if the "investments" were timely made, and the deductions claimed by these late investors were fraudulent.

*Specific SCE Funds: Coastal Properties Holdings, LLC*

74.     On or about November 18, 2015, Promoter A and Attorney A organized, or caused to be organized, Coastal Properties Holdings, LLC ("CPH"), a Georgia limited liability company.  CPH purchased a 96% interest in Crimson Argent LLC ("Crimson Argent"), which owns a 99% interest in Crimson Independence LLC ("Crimson Independence").  Crimson Independence owned approximately 3,244 acres of real property in Jasper County, South Carolina.  On December 30, 2016, Crimson Independence donated a conservation easement on approximately 1,330 acres of that property to Land Conservancy 1.   Appraiser 2 prepared an appraisal valuing the easement at $179,760,000. Promoter A, AGEE, and others sold "investment" units in CPH to at least 390 investor-taxpayers. The $179,760,000 "charitable contribution" and corresponding deduction were passed through CPH to each client-taxpayer partner of the Fund.  Thus, each of the investor-taxpayers in CPH received a Schedule K-1 reporting a charitable contribution more than four times his or her capital contribution.

75.     Promoter A, AGEE, and other co-conspirators improperly sold units of interest in CPH after the close of the tax year.  At least 26 investor-taxpayers purchased units after the close of the tax year and received false Schedules K-1, and the deductions claimed by these late investors were fraudulent.

*Specific SCE Funds: Coastal Community Partners*

76.     On or about September 14, 2016, Promoter A and other co-conspirators organized Coastal Community Partners, LLC ("CCP"), a Georgia limited liability company. CCP purchased a 99% interest in Figure 8 (Georgia) LLC ("Figure 8"), which owned a 1,202 acre parcel of real property in Chatham County, Georgia.  The real property was originally purchased in September 2010 for approximately $21,389,382.

77.     On December 28, 2017, Figure 8 donated a conservation easement on approximately 863 acres of the property to Land Conservancy 2. Appraiser B prepared an appraisal valuing the easement at $96,810,000. Promoter A, AGEE, and other co-conspirators sold units of interest in CCP to 196 investors. The $96,810,000 "charitable contribution" and corresponding deduction was passed through CCP to each client-taxpayer partner of CCP. Thus, each of the investors in CCP received a Schedule K-1 reporting a charitable contribution more than four times his or her capital contribution.

78.     Promoter A, AGEE, and other co-conspirators improperly promoted and sold units of interest in CCP after the close of the 2017 tax year. For some of these late investors, Promoter A, AGEE, and other co-conspirators instructed investor-taxpayers who did not timely invest to sign promissory notes promising to pay for their "investments" at a later date. Attorneys A and B drafted the promissory notes. AGEE and other co-conspirators instructed investor-taxpayers to fraudulently backdate these promissory notes to make it appear as if they had been entered into prior to the close of the tax year when, in fact, they were executed well after the close of the tax year.

79.     The promissory note option was specifically—although not exclusively—offered to large investors who anticipated substantial income for the 2018 tax year. Promoter A, AGEE, and other co-conspirators pitched the CCP fund to certain clients by advising them that the tax deduction generated by the CCP fund could be carried forward from the 2017 tax year to the 2018 tax year. The clients were also told that this carry-forward would be useful, in particular, if the tax law changed to be more restrictive with respect to conservation easements.

*Specific SCE Funds: Southeast Property Acquisitions LLC*

80.     On or about December 26, 2017, Promoter A and other co-conspirators organized Southeast Property Acquisitions, LLC ("SPA"), a Nevada limited liability company. SPA was formed for the purpose of purchasing an 80% interest in Equity Investment Associates, LLC ("Equity Investment Associates"), which owned 1,920 acres of real property on Oak Island, North Carolina.

81.     On December 27, 2018, Equity Investment Associates donated a conservation easement on that property to Land Conservancy 2. Appraiser 1 prepared an appraisal valuing the easement at $223,050,000 as of December 2018.

82.     Promoter A, AGEE, and other co-conspirators sold units of interest in SPA to 416 investors. A $178,440,000 "charitable contribution" and corresponding deduction was passed through SPA to each client-taxpayer in the SPA Fund. Thus,

17

each of the investors in SPA received a Schedule K-1 reporting a charitable contribution more than four times his or her capital contribution.

83. Promoter A, AGEE, and other co-conspirators improperly promoted and sold units of interest in SPA after the close of the 2018 tax year. AGEE told some of his clients that the documents needed to be backdated in order to make it appear as if they had been executed in the 2018 tax year. At least 39 investor-taxpayers purchased units after the close of the tax year, and the deductions claimed by those investors were fraudulent.

## Preparation of False and Fraudulent Income Tax Returns

84. AGEE prepared and supervised the preparation of false and fraudulent partnership tax returns for the SCE Funds from at least 2014 through 2019. These tax returns reported bogus charitable contribution deductions related to syndicated conservation easement donations that AGEE knew to be fraudulent tax shelters, in that he knew they were conducted for the sole purpose of generating tax deductions.

85. Additionally, AGEE willfully prepared false and fraudulent individual income tax returns for his own clients that reflected the fraudulent tax deductions generated by the syndicated conservation easement transactions. For many of these clients' tax returns, AGEE also knew that the clients had invested in the SCE Funds after the close of the tax year, and that the clients therefore would not be entitled to take a charitable deduction related to the SCE donations that were reported on their tax returns, even if the "investment" was otherwise legitimate—which it was not.

## Additional Attempts to Deceive and Impede the IRS

86. In mid-2018, Individual A, referenced above, told Promoter A that the IRS had initiated an audit of Individual B's tax returns and requested tax documentation relating to tax years 2014, 2015, and 2016. Among other things, Individual A told Promoter A that the IRS was asking for documentation relating to the conservation easement deductions taken by Individual B on his tax returns. Individual A told Promoter A that the IRS had requested copies of the purchase and sale agreements and other documents related to the Fort Myers and Thompson Mountain transactions.

87. Individual B requested assistance from Promoter A in responding to the IRS. Promoter A enlisted AGEE and Staff Accountant A to assist Individual B. Staff Accountant A worked under the direction of AGEE. Promoter A, concerned that the IRS review of Individual B's tax returns would prompt the IRS to look more closely at the Thompson Mountain transaction as a whole, requested that AGEE attempt to delay

18

the IRS past the statute of limitations date for initiating an audit of the conservation easement transactions themselves.

88.    Promoter A knew that certain documents related to the Fort Myers and Thompson Mountain transactions had never been executed, and that no final agreement for a purchase of an interest in Thompson Mountain by Promoter A's associated SCE Fund had ever been reached.

89.    Promoter A therefore informed Individuals A and B that they would need to backdate certain documents in order to make the transactions look legitimate for the IRS. For example, Promoter A pushed Individual B to execute a backdated written agreement documenting the sale of a controlling 98% interest in Thompson Mountain to SAIF 2014. Recognizing that the IRS might ask about fully executed documents, Promoter A informed Individuals A and B during a recorded call that "[t]hese agreements need to match the tax returns, whatever was actually filed."

90.    Among other infirmities with the underlying transactions, AGEE knew that the documents related to the Thompson Mountain transaction had not been signed or finalized and that, as a result, SAIF 2014 was likely not entitled to take any charitable contribution deduction for the purported easement donation made by Thompson Mountain in December 2014. AGEE also was aware that certain documents related to the earlier Fort Myers transaction also needed to be signed.

91.    On behalf of Promoter A, Attorney B provided the relevant documents to Individual B to be signed and backdated. AGEE explained to Individual A that he found backdating documents "necessary at times."

92.    Additionally, as requested by Promoter A, AGEE deliberately delayed providing the IRS with certain information until the expiration of the statutory period of time for initiating an examination of the Fort Myers partnership. As AGEE explained to Individual B during a recorded call:

> "… I was, for lack of a better term, I was playing a little game with the auditor and the game was, I was waiting on getting documents until we got past September 3rd…until I was confident the statute had cleared on Fort Myers partnership to where they [presumably IRS] could not pull it for an examination."

93.    All of this was consistent with Promoter A's usual approach to IRS scrutiny. If any investors contacted Promoter A about IRS scrutiny of their individual tax returns, Promoter A would typically try to steer them to AGEE and his firm to handle the interactions with the IRS, because Promoter A wanted AGEE to control the

19

flow of documents to the IRS. Promoter A, Attorney C, and AGEE agreed to attempt to delay audits until after the statute of limitations relating to the conservation easement deductions had expired.

## Tax Loss Caused by the Fraudulent Tax Shelters

94.    Because the SCE Fund transactions were planned, structured, and executed for the sole purpose of generating huge tax deductions for investors (and therefore lacked any other economic substance and business purpose), Promoter A's tax shelters resulted in a massive evasion of taxes, all facilitated by Promoter A, AGEE, and other unnamed coconspirators on behalf of their clients and investors.

95.    For example, from 2013 through 2018, Promoter A's SCE Funds were marketed and sold to at least 1,500 wealthy individuals as tax shelters, and over the same period of time, they generated at least $1.2 billion in false and fraudulent tax deductions.

## Financial Benefits to AGEE

96.    All of Promoter A's SCE Funds paid out money, sourced from the investors, to Promoter A and his enterprise, usually in the form of a "management fee" paid to Company 1 or whatever other registered entity Promoter A and his co-conspirators assigned to act as the manager. Promoter A used these fees, in part, to pay commissions to the SCE Funds' various sub-promoters, including AGEE.

97.    AGEE began receiving commissions from Promoter A for promoting the SCE Funds to tax clients in 2013. Promoter A paid the commissions to LLC-1, which was owned by AGEE and two other partners from Accounting Firm 1. Promoter A paid the commissions to LLC-1 to keep the revenue outside of Accounting Firm 1.

98.    AGEE did not disclose his receipt of commissions from Promoter A for the sale of the SCE Funds to his clients. Instead, AGEE described the commissions to his clients as due diligence fees, consulting fees, and additional tax preparation fees. In total, for the years 2013 through 2019, AGEE received more than $1.7 million in commissions.

99.    From time to time, Promoter A also gave to AGEE, through LLC-1, units in the SCE Funds as additional compensation. These units in the SCE Funds were used to offset income earned by LLC-1, and the deduction flowed-through to AGEE's individual income tax return, as well as to the other two members of LLC-1. AGEE did not report the units as income on LLC-1's partnership returns, despite the fact that neither AGEE nor LLC-1 paid for the units.

## Charging Paragraphs

## COUNT ONE
### Conspiracy to Defraud the United States
### 18 U.S.C. § 371

100.     Count One incorporates the allegations set forth in paragraphs One through Ninety-Nine of this Bill of Information by reference.

101.     Beginning at least as early as 2013 and continuing through at least December 2019, both dates being approximate and inclusive, in Buncombe County, within the Western District of North Carolina, and elsewhere, the Defendant,

## STEIN AGEE

did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree with other individuals both known and unknown to the United States Attorney to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Department of Treasury in the ascertainment, computation, assessment, and collection of revenue, that is, U.S. individual income taxes.

### Object of the Conspiracy

102.     It was a part and object of the conspiracy that, from at least 2013 until in or about December 2019, the Defendant, STEIN AGEE, and others known and unknown to the United States Attorney, did unlawfully, voluntarily, intentionally, and knowingly defraud the United States of America and an agency thereof, that is, the Internal Revenue Service of the Department of Treasury, by impeding, impairing, defeating, and obstructing the lawful governmental functions of the IRS in the ascertainment, assessment, and collection of income taxes through the design, marketing, and implementation of fraudulent tax shelter transactions in the form of syndicated conservation easement donations.

### Manner and Means

103.     AGEE and his co-conspirators, and others known and unknown to the United States Attorney, carried out the object of the conspiracy according to the following manner and means, among others:

21

a.    They designed, marketed, and implemented the fraudulent syndicated conservation easement transactions, and created false and fraudulent factual scenarios to support those transactions;

b.    They designed, marketed, and implemented the SCE transactions in ways that impeded and obstructed the ability of the IRS to detect the fraudulent nature of the transactions;

c.    They provided the tax savings ratio to prospective investors before Appraiser 1 or Appraiser 2 had appraised the value of the easement.

d.    They caused Appraiser 1 and Appraiser 2 to falsely inflate their appraisals of easements in order to achieve the desired amount of tax deductions for the investors.

e.    They designed, marketed, and implemented the SCE transactions to disguise the fact that the SCE transactions were tax-motivated and lacked any non-tax business purpose;

f.    They prepared and assisted in preparing, and caused to be prepared, false and fraudulent documents to deceive the IRS, including but not limited to, backdating subscription agreements, checks, and promissory notes;

g.    They prepared and caused to be prepared tax returns for the SCE clients that were false and fraudulent because, among other things, they claimed fraudulent tax deductions related to the conservation easement deduction, and thereby substantially understated the tax due and owing by the SCE clients;

h.    They prepared and caused to be prepared fraudulent documents to be provided to the IRS in the event of an IRS audit;  and

i.    They paid, caused to be paid, and received referral fees and commissions, which were frequently not disclosed to the clients, as a means of rewarding those who marketed the syndicated conservation easement scheme and to provide incentives to others to do so.

22

<u>Overt Acts</u>

104. To accomplish the objects of the conspiracy, AGEE and his co-conspirators, and others known and unknown to the United States Attorney, committed and caused to be committed the following overt acts, among others, in the Western District of North Carolina and elsewhere:

a. On or about July 3, 2013, Promoter A, together with Attorneys A and B, organized Inland Capital Investment Fund 2013 ("ICIF 2013"), as a North Carolina limited partnership.

b. Beginning sometime in 2013, Promoter A, AGEE, and others began marketing ICIF 2013 to investors as a "tax-savings" vehicle.

c. In or around December 2013, Promoter A caused ICIF 2013 to purchase a 98% interest in Fort Myers. Shortly thereafter, in December 2013, Promoter A caused Fort Myers to donate a conservation easement to Land Conservancy 1, valued by Appraiser 1 to be worth $66,214,000.

d. In or around early December 2013, AGEE, Promoter A, and Attorney A met to discuss how best to facilitate the sale of the unsold units in ICIF 2013 after the end of the year. During the meeting, they agreed to establish Green Fields Investments, LLC, and allocate a portion of the unsold "investment" units in ICIF 2013 to that entity in order to disguise the sale of units after the close of the 2013 tax year.

e. On or about December 28, 2013, Promoter A, Attorney A, and other co-conspirators organized, or caused to be organized, Green Fields Investments, LLC in the state of North Carolina.

f. On or about December 30, 2013, Promoter A and Attorney A organized, or caused to be organized, Petite Pines Holdings, LLC in North Carolina. Petite Pines Holdings held a 4.372% interest in ICIF 2013. Similar to Green Fields, Promoter A and other co-conspirators used Petite Pines to distribute units in ICIF 2013 after the close of the tax year. In total, six taxpayer-investors, through Petite Pines, obtained units in ICIF 2013 after the close of the tax year.

g.    On December 30, 2013, Promoter A and other co-conspirators caused Fort Myers to donate a conservation easement over approximately 280.96 acres of the Fort Myers real property to Land Conservancy 1.

h.    In or about April 2014, Promoter A and other co-conspirators opened or caused to be opened a bank account held in the name of Green Fields. AGEE served as one of the signatories on the account.

i.    In 2014, AGEE and other co-conspirators sold units of "investment" in ICIF 2013 through Green Fields and Petite Pines to make it appear as if the "investments" were made in 2013.

j.    For example, on April 3, 2014, AGEE emailed the managing agent of his client, F.G., to inform him that he and Promoter A were "closing out the [2013] conservation easement partnership and need to determine if [F.G.] is going to want any easements?...the 2013 program will be closed very soon, i.e, in the next couple of days." On May 11, 2014, AGEE emailed Promoter A a copy of F.G.'s signed and backdated subscription agreement for Green Fields that was backdated to December 28, 2013.

k.    In 2014, Promoter A, AGEE, and other co-conspirators also arranged for the free, late participation in ICIF 2013, through Green Fields, of certain investors whose "investments" in a prior SCE Fund organized by Promoter A had been reduced following a previous IRS audit, thereby diluting the shares of the investors who actually paid to participate in ICIF 2013, and without disclosing the arrangement to those paying investors.

l.    On or about September 11, 2014, AGEE prepared and caused to be prepared, and filed or caused to be filed, a false and fraudulent Form 1065, U.S. Return of Partnership Income, for ICIF 2013, which claimed a non-cash charitable contribution deduction in the amount of $60,535,658.

m.    On or about September 12, 2014, AGEE prepared and caused to be prepared, and filed and caused to be filed, a false and fraudulent Form 1065, U.S. Return of Partnership Income, for Green Fields claiming a non-cash charitable contribution deduction in the

24

amount of $22,826,790 that flowed through from ICIF 2013's partnership return.

n.   In or around September 2014, AGEE prepared a false Form 1065, U.S. Return of Partnership Income, for Petite Pines Holdings reporting a flow-through conservation easement charitable deduction from ICIF 2013. AGEE also prepared false Schedules K-1 for Petite Pines that reported a flow through charitable contribution deduction to the investors in the amount of $2,837,146 that was attributable to the ICIF 2013 conservation easement donation.

o.   In or around October 2014, AGEE prepared a false and fraudulent return for client F.G. that reported a non-cash charitable contribution in the amount of $1,858,248 that flowed through to his return from ICIF 2013, via Green Fields. AGEE knew, at the time he prepared the return that F.G. had not paid for the "investment" units in Green Fields that resulted in him claiming the deduction on his tax return.

p.   On or around October 30, 2014, Promoter A and other co-conspirators organized and caused be organized Southern Appalachian Investment Fund 2014, LLC.

q.   On or about December 19, 2014, Promoter A and other co-conspirators organized Inland Capital Appalachian Fund 2015 ("ICAF 2015"), a Georgia limited liability company.

r.   On December 23, 2014, Promoter A and other co-conspirators caused Thompson Mountain to donate a conservation easement to Land Conservancy 1.

s.   In 2015, Promoter A and other co-conspirators sold units of interest in SAIF 2014 to late investors and backdated and caused to be backdated the payments and documents related to the investor-taxpayers' late "investments."

t.   On or around September 14, 2015, AGEE prepared a Form 1065, U.S. Return of Partnership Income, for SAIF 2014 that claimed a flow-through conservation easement donation in the amount of $23,512,800 that was false in that, among other things, SAIF 2014

25

did not legally hold an interest in Thompson Mountain and therefore was not entitled to claim any deductions related to the conservation easement donation.

u.  On or around September 15, 2015, AGEE prepared a false Form 1065, U.S. Return of Partnership Income, for Thompson Mountain that reported a conservation easement donation charitable deduction in the amount of $24,240,000.

v.  On or about November 18, 2015, Promoter A and Attorney A organized, or caused to be organized, Coastal Properties Holdings, LLC ("CPH"), a Georgia limited liability company. CPH, through Crimson Argent LLC, purchased a 99% interest in Crimson Independence, LLC, which owned approximately 3,244 acres of real property in Jasper County, South Carolina.

w.  In 2016, Promoter A, AGEE, and other co-conspirators sold units of "investment" in ICAF 2015 and backdated, and caused to be backdated, related "investment" documents to make it appear that the "investments" had been made in 2015.

x.  On or around September 2016, AGEE prepared a false Form 1065, U.S. Return of Partnership Income for ICAF 2015 that claimed a flow-through conservation easement donation in the amount of $10,780,000.

y.  In or around April 2016, AGEE prepared false Schedules K-1 for ICAF 2015's 63 investors that reported their pro-rata share of the conservation easement donation charitable deduction.

z.  In or around September 14, 2016, Promoter A and other co-conspirators organized or caused to be organized Coastal Community Partners, LLC ("CCP").

aa.  In or around December 2016, as suggested by Promoter A, AGEE instructed investors J.C. and J.B. to "vote" for the development option for the CPH Fund, explaining that that for "optics," some investors needed to vote for the development option to make the vote appear more legitimate. He further explained that there were already enough "green option" votes so the conservation easement

donation was ensured. J.C. and J.B. thereafter voted for the development option knowing that the green option would prevail.

bb.    On December 30, 2016, Promoter A and other co-conspirators caused Crimson Independence, LLC to donate a conservation easement over 1,330 acres to Land Conservancy 1 that was valued by Appraiser 2 at $179,760,000.

cc.    In 2017, Promoter A, AGEE, and other co-conspirators sold units of "investment" in CPH and backdated, and caused to be backdated, related "investment" documents, to make it appear that the "investments" had been made in 2016.

dd.    In or around September 2017, AGEE prepared a false Form 1065, U.S. Return of Partnership Income for CPH that claimed a flow-through conservation easement donation in the amount of $185,304,557.

ee.    In late 2017, AGEE, Promoter A, and Attorney A met to discuss using promissory notes for late investors in CCP instead of backdated checks and subscription agreements.

ff.    On or about December 26, 2017, Promoter A and other co-conspirators organized Southeast Property Acquisitions, LLC ("SPA"), a Nevada limited liability company.

gg.    On December 28, 2017, Promoter A and other co-conspirators caused Figure 8 (Georgia), LLC to donate a conservation easement to Land Conservancy 2.

hh.    On December 30, 2017, AGEE emailed client J.B. attaching his subscription agreement for CCP that was dated December 28, 2017. In the email, AGEE stated, "You can fund the "investment" after year-end so do not feel like you have to do that today. We just need the subscription document executed. Please note that I have inserted the signature date for a reason. Please leave as this date. I can explain verbally on the date if you have questions." Client J.B. wired the funds in January 2018. Nonetheless, knowing client J.B. had not timely invested, in or around October 2018, AGEE prepared J.B.'s 2017 federal income tax return and included the

27

conservation easement charitable contribution donation flowing through from CCP.

ii. In 2018, Promoter A, AGEE, and others sold units of "investment" in CCP and backdated, and caused to be backdated, related "investment" documents, including promissory notes, to make it appear that the "investments" had been made in 2017.

jj. In or around July 2018, Promoter A asked AGEE to use the audit of Individual B as leverage to persuade Individuals A and B to execute documents that had never been executed related to Fort Myers and Thompson Mountain. In the alternative, Promoter A asked AGEE to delay the audit past the statute of limitations for the Fort Myers and Thompson Mountain transactions when they would no longer need to provide executed documents to the IRS for purposes of the audit.

kk. On or about July 17, 2018, Promoter A informed Individual A and Individual B that they would the need to delay the audit past the statute of limitations date for the conservation easement funds related to the tax returns under audit.

ll. On or about July 17, 2018, Promoter A informed Individuals A and B that they would need to backdate certain documents in order to correctly paper the Fort Myers and Thompson Mountain transactions for the IRS audit.

mm. On or about September 12, 2018, AGEE again reiterated to Individual B that the deal paperwork needed to be signed and backdated. In order to avoid creating a paper trail, AGEE informed Individual B that the documents would be sent by FedEx.

nn. On or around September 15, 2018, AGEE prepared a false Form 1065, U.S. Return of Partnership Income, for CCP that reported a flow-through conservation easement donation charitable deduction in the amount of $95,841,900.

oo. In or around October 5, 2018, AGEE informed Individual B that additional documents relating to the Thompson Mountain transaction would need to be signed, backdated, and provided to the IRS.

pp.   In or around October 5, 2018, AGEE again informed Individual B that he and Attorney C were "carefully guiding what documents we send to the IRS. And we've also done it based on timing so that the statutes start to expire before we provide certain things."

qq.   In the fall of 2018, Promoter A began marketing "investments" in Southeast Property Acquisitions, LLC.

rr.   On December 27, 2018, Promoter A and other co-conspirators caused Equity Investment Associates, LLC, to donate a conservation easement to Land Conservancy 2.

ss.   In 2019, Promoter A, AGEE, and other co-conspirators sold units of "investment" in SPA, LLC and backdated the related "investment" records to make it appear as if the "investments" were made in 2018.

tt.   On or about September 16, 2019, AGEE prepared a false Form 1065, U.S. Return of Partnership Income, for SPA reporting a flow-through conservation easement charitable donation deduction in the amount of $178,440,000.

uu.   On or about September 16, 2019, AGEE prepared false Forms K-1 for 416 investors in SPA that reported their pro-rata share of the $178,440,000 flow-through charitable contribution deduction.

vv.   In 2020, Promoter A informed AGEE that he had met with several other co-conspirators to ensure that they were on the "same page" about the late "investments." AGEE understood this to mean that they would agree to claim, falsely, that all of the late investors had timely subscribed to the SCE Funds.

ww.   Similarly, as he had on prior occasions, in 2020 Promoter A suggested AGEE could claim, falsely, that the backdated checks the government had recovered were not deposited until after the close of the tax year because they had simply been "lost" on somebody's desk.

xx.   On or about November 4, 2020, Promoter A left a handwritten note for AGEE in AGEE's office at Accounting Firm 1, stating that he

29

had been "cleaning up the books." Promoter A informed AGEE that AGEE's client J.B. had a "$100,000 receivable outstanding in SPA." Promoter A also referenced a 2017 SCE Fund and stated that the tax return for the Fund had a Schedule K-1 issued to an "LTS investor" in the amount of $750,000.

All in violation of Title 18, United States Code, Section 371.

R. ANDREW MURRAY
UNITED STATES ATTORNEY

_____
DANIEL V. BRADLEY
CARYN FINLEY
ASSISTANT UNITED STATES ATTORNEYS

_____
BRITTNEY CAMPBELL
GRACE ALBINSON
TRIAL ATTORNEYS, TAX DIVISION
UNITES STATES DEPARTMENT OF JUSTICE

30